# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA

---

CARGILL COMMISSION COMPANY v. F. A. SWARTWOOD
AND OTHERS.[1]

April 4, 1924.

No. 23,749.

**Parol evidence inadmissible to vary written contract of guaranty.**

1. Defendants gave plaintiff their written guaranty of all moneys requested by and furnished to a milling company. There was no limitation of the amount or purposes of the advances so guaranteed. Those made were all at the request of the milling company and used for its benefit and proper corporate purposes. *Held* that the written contract cannot be varied or contradicted by parol evidence that there was an agreement that the advances were to be kept within a certain limit, or to be made for but one special purpose, or for use at but one place.

**When admissible in such case.**

2. In such a case parol evidence is admissible insofar as it is necessary, and no farther, to enable the court to apply the written contract.

**When omitted portions may be proved by parol.**

3. If a written contract is not complete—that is, if it does not express the entire contractual assent of the parties—the omitted portions may be proved by parol evidence. But the test of the com-

[1] Reported in 198 N. W. 536.

pleteness of the written contract is the document itself. If it appears to be complete, that ends the inquiry, and parol evidence is inadmissible to prove first, the fact, and then the purpose of the alleged omission.

**If necessary, omission may be proved by extrinsic evidence.**

4. While the only criterion of the completeness of the written contract is the writing itself, the incompleteness need not appear on the face of the document from a mere inspection. It is enough that the omission appear when the court, aided, if necessary, and only if necessary, by extrinsic evidence, comes to apply the contract to its proper subject matter.

**When contract cannot be contradicted by evidence of oral agreement on collateral matter.**

5. A contract, appearing on its face and in application to its subject matter to be complete, cannot be contradicted by evidence of an alleged oral agreement concerning a collateral matter which might have been included in the writing had the contractual assent gone so far, it being as objectionable to contradict that which is clearly expressed by silence as that stated in words.

Action in the district court for Waseca county to recover $47,-788.27 and interest. The case was tried before Childress, J., who when plaintiff rested and at the close of the testimony denied plaintiff's motion for a directed verdict, and a jury which returned a verdict in favor of defendants. From an order, Converse, J., denying its motion for judgment notwithstanding the verdict or for a new trial, plaintiff appealed. Reversed and remanded.

*Harold G. Simpson* and *Henry M. Gallagher*, for appellant.

*Moonan & Moonan*, for respondents.

STONE, J.

Action on a written contract of guaranty. Verdict for defendants and appeal by plaintiff from the denial of its blended motion for judgment notwithstanding or a new trial.

The trial was had before Honorable Arthur B. Childress, former judge of the Fifth judicial district. The motion for judgment or a new trial did not come on for hearing until after his retirement

from office, when it was submitted to and the order denying it made by Honorable W. L. Converse, one of the judges of the First judicial district.

The Waseca Milling Company (for brevity hereinafter referred to as the milling company), during 1919 and for some years previously was engaged in the milling and elevator business at Waseca.

It ground some flour, but seems to have engaged to a greater extent in an ordinary elevator business and in the grinding and preparation of stock foods. It is now bankrupt.

During the times here in question, defendant F. A. Swartwood was the president, and his son, defendant H. P. Swartwood, the secretary and treasurer, of the milling company. The latter was in the immediate and active charge of its business. Defendant Moore was "connected" with the milling company, in what capacity the record does not disclose. It is silent also as to the relationship of defendant McPeak to the milling company.

Plaintiff does a general grain commission business and has its principal office in Minneapolis. The milling company was one of its customers. Before the opening of the 1919-1920 grain season, and before a line of credit was extended to the milling company for that season, plaintiff required of defendants—they being the individuals most directly interested in the milling company—the written guaranty about to be dealt with. That guaranty was executed by defendants on July 5, 1919, at Waseca. It was sent by plaintiff from Minneapolis to defendant F. A. Swartwood, who, without any assistance from plaintiff and in the absence of a representative of plaintiff, procured the signatures of his codefendants.

The guaranty so procured is the basis of plaintiff's cause of action. It contains the joint and several request and authorization of defendants to plaintiff "to furnish" to the milling company "any and all sums of money that the milling company may request of said Cargill Commission Company."

In consideration of its compliance with that authorization and request, and of the additional recited consideration of one dollar paid to each of them, the defendants jointly and severally guar-

anteed to plaintiff the payment by the milling company "at their respective maturities of all sums of money with interest thereon. heretofore or hereafter furnished" the milling company by plaintiff.

The contract further provides as follows:

"This authority and request to furnish money to said Waseca Milling Company is to remain in force until the receipt by said Cargill Commission Company at its office in the city of Minneapolis, Minn. of an instrument in writing signed by the undersigned, terminating and revoking the same."

This undertaking was furnished to plaintiff after the milling company's line of credit with plaintiff had been arranged by its president, defendant F. A. Swartwood. It was agreed that the promised credit should not exceed $25,000. The testimony for defendants is that it was the distinct understanding that the money so furnished would be used by the milling company at Waseca only; that it would procure it in the conventional manner on drafts as needed and that it would be used to buy grain at Waseca to be shipped to plaintiff and for no other purpose.

When the guaranty was procured, the milling company was already indebted to plaintiff in a relatively small sum. As the season advanced into autumn, the transactions ran into large figures. Plaintiff advanced to the milling company large sums on its drafts which were used at Waseca for the purchase of grain. On this phase of the account the debits and credits about balance, and, if that were all, the milling company would not now be in plaintiff's debt. That is, the grain purchased by the milling company at Waseca and shipped and sold to plaintiff more than offsets the money furnished and used in the purchase of that grain.

Now we come to the real subject matter of this lawsuit and the thing from which arises the only issue for determination.

Although it is insisted by defendants that the negotiations preceding the guaranty contemplated only the furnishing of money for use at Waseca, the fact is that the contract had not been in force very long when, at the request of the milling company, plaintiff

began purchasing for it at Minneapolis grain to be shipped to the mill at Waseca, and which was actually so shipped and used there. That portion of the account involves a larger amount than the other. It went into such large figures that now, after allowing all credits, the milling company is indebted to the plaintiff in excess of $40,000. A small portion of the grain so shipped to Waseca was sold directly by plaintiff. Most of it was purchased on the open market for the account of the milling company.

The defense interposed, successfully in the court below, is the claim of defendants that their guaranty was really limited to $25,000. They refer to the original negotiations as to the limit of the milling company's credit and assert that the only moneys guaranteed were those furnished for use at Waseca in the manner indicated. The moneys so advanced being offset by the grain purchased therewith and shipped to plaintiff, defendants now say that there is no remaining obligation against them. Plaintiff urges that the asserted defense is without merit because the written contract does not particularize and covers all moneys furnished at the milling company's request for whatever purpose or wherever used.

Plaintiff concedes that the credit originally contemplated was not to exceed $25,000. It was increased finally on account of a car shortage as the result of which the milling company's storage capacity was filled with grain for which it had paid, but out of which it could not get its money except as cars were forthcoming to take it to terminal markets. That condition was very general during the fall of 1919.

The learned trial judge left to the jury the construction of the contract. He told them that it seemed to him "somewhat ambiguous" and that it was a jury question whether the guaranty protected the plaintiff only to the extent of the money furnished for use at Waseca or covered also that expended at Minneapolis in the purchase of grain for the milling company. In other words, notwithstanding its literal and unequivocal *contrary* effect, it was left to the jury to say that the written contract did not cover money furnished at Minneapolis, or elsewhere outside of Waseca. As a result of that instruction, the jury attempted to relieve defendants

from all obligation, notwithstanding that plaintiff still had more than $40,000 coming from the milling company—all furnished at its request and used for its own proper corporate purposes.

This appeal brings here the one issue as to the construction of the contract. Necessarily we resolve it for plaintiff and hold all of the funds, for whatever purpose or wherever used, and whether the advance was in the shape of an actual transfer of money or the setting up of a credit of which the milling company had the benefit, or took the form of grain sold directly by plaintiff to the milling company, are covered by the express terms of the guaranty.

We are not at all concerned, there being no suggestion of fraud or mistake, with the negotiations preceding the written contract. That instrument was the final expression of the contractual assent of the parties. It is not to be varied to any extent—particularly it is not to be emasculated in the way here attempted—by the introduction of parol evidence concerning what one party claims and the other denies to have been a controlling part of the preceding negotiations.

The rule against such a use of evidence of preceding or contemporaneous oral agreements is designed to prevent any such disastrous attack upon the obligation of a contract. Were it otherwise, written contracts would be enforced, not according to the plain effect of their language, but pursuant to the story of their negotiation as told by the litigant having at the time being the greater power of persuading the trier of fact. So far as contracts are concerned, the rule of law would give way to the mere notions of men as to who should win lawsuits.

Take this case for example. By their solemn, written, contractual word, defendants requested plaintiff to furnish money to the milling company and guaranteed its payment. Both the request and the guaranty were unconditional. Neither was restricted to money to be furnished for use and actually used at Waseca. So far as the phrasing of the contract is concerned, both its request and its guaranty would apply to money furnished at the request and for the benefit of the milling company in Asia, if such a thing had been

possible. Money so furnished would be as clearly within the literal meaning of the contract as any other.

If the result of the trial were permitted to stand, the larger amount represented by plaintiff's funds used at the request and for the benefit of the milling company at Minneapolis, would be excluded and beyond recovery, notwithstanding the fact that there is every reason, in morals, as well as in law, for including it.

The terms of the contract cover it. It was as much requested by the milling company as were the funds at Waseca. It resulted in as much benefit to that corporation. The milling company used all of the grain shipped to it from Minneapolis by plaintiff. All of it was ground by the milling company into stock feed and sold. Thus it was converted into cash which went into the milling company's assets.

The utterly indefensible ethical character of the result below is obvious. It is just as indefensible in law because of the clear violation of the rule which prevents the destruction of the obligation of a written contract by evidence of preceding or contemporaneous oral agreements. Without that rule there would be no assurance of the enforceability of a written contract. If such assurance were removed today from our law, general disaster would result, because of the consequent destruction of confidence, for the tremendous but closely adjusted machinery of modern business cannot function at all without confidence in the enforceability of contracts. They must not be reduced to the innocuous character of a mere "scrap of paper."

If such confidence were removed, the poor man, he who is in immediate need of real money, would be the greatest sufferer. In the instant case, it may be very safely assumed that many a Waseca county farmer got spot cash for his wheat in the fall of 1919, notwithstanding the car shortage, solely because the plaintiff had so much confidence in the solemn pledge of defendants' contractual word, evidenced by the guaranty now in suit, that it felt safe in pledging its own credit in order to keep on furnishing money to the milling company.

To say the least, after a confidence so invited and reposed, it would be poor law, and a perversion of all ethical standards as well, to permit defendants, placed as are the respondents here, to escape the major portion of the liability so clearly assumed by them.

The introduction of proof of the oral arrangement between plaintiff and defendant F. A. Swartwood, is sought to be justified because it shows the contract between plaintiff and the milling company. That contract (if there was a continuing contract, which may be doubted), could not control the written one between plaintiff and defendants, unless the latter were ambiguous, which it is not. If it were, the arrangement between plaintiff and the milling company might be resorted to as an aid to construction and not otherwise.

The testimony was equally improper upon the theory of any supposed failure of the guaranty to express all of the contract between the parties. It is true that if a written contract is incomplete, if it fails to express the entire contractual assent, the omission may be made good by parol evidence. But, in that connection, it must be remembered that the test of the completeness of a written contract is the document itself. If it appears to be complete, that ends the inquiry and parol evidence is inadmissible to prove first the fact, and then the purport, of the alleged omission.

That is an indefensible device which here received rather emphatic disapproval in Samuel A. Chute Co. v. Latta, 123 Minn. 69, 142 N. W. 1048. Its result, as there indicated, would be "to permit the very evil which the rule" against destroying the obligation of a written contract by oral evidence "was designed to prevent." That case followed and applied Thompson v. Libby, 34 Minn. 374, 26 N. W. 1, and Wheaton Roller Mill Co. v. John T. Noye Mnfg. Co. 66 Minn. 156, 68 N. W. 854.

The statement as to the controlling effect of a written contract on the question of its own completeness, and the dependent problem whether parol evidence is admissible to prove an omission, formulated by Mr. Justice Mitchell in Thompson v. Libby, has met with marked approval in other jurisdictions. See, e. g. Union Selling Co. v. Jones, 128 Fed. 672, 63 C. C. A. 224, and Electric Storage

Battery Co. v. Waterloo C. F. & N. R. Co. 138 Iowa, 369, 116 N. W. 144, 19 L. R. A. (N. S.) 1183.

Here, the evidence of plaintiff's dealings with the milling company including the preliminary negotiations with its president, was admissible for the one purpose of enabling the court to apply the contract to its proper subject matter, determine the resulting obligations, and, when so determined, to enforce them according to the contract, and that alone.

In arriving at this conclusion, we have not been unmindful of the "true rule" as phrased in Wheaton Roller Mill Co. v. John T. Noye Mnfg. Co. supra, that while "the only criterion of the completeness of the written contract * * * is the writing itself, the incompleteness need not "appear on the face of the document from mere inspection." It is enough that the omission appear when the court, aided if necessary, and *only if necessary*, by extrinsic evidence, comes to apply the contract to the designated subject matter.

Even then no omission can be considered to appear; nor can proof of one be allowed, simply because the document, though complete on its face and in application, omits to cover a collateral matter which might have been provided for had the contractual assent gone so far.

For example, a contract for the sale of personal property, otherwise complete, cannot be rendered incomplete by parol evidence that there was in fact a warranty. That is our rule and has been since Thompson v. Libby, supra. Other authorities are dealt with in the note in 19 L. R. A. (N. S.) 1183.

There is much more reason for excluding parol proof of a limitation upon the liability of the guarantor than there is for rejecting proof of an oral warranty where there is a contract of sale which is silent as to warranty. This arises from the fact that so to permit a limitation of the guaranty would be to contradict and cut down the general undertaking expressed in the writing. That, of course, is never permissible. What is written in a contract cannot be so varied, however incomplete the writing may be. But, frequently the excluded proof of oral warranties does not tend to alter what is written. It is excluded because it is as objectionable to con-

tradict what is clearly expressed by silence as that stated in words. In the drafting of written contracts it certainly is not required to negative every undertaking not intended to be assumed. Ordinarily silence is as expressive there as it is when appropriately used elsewhere. It is urged here that contracts of guaranty, as to amount and duration, must be given a reasonable construction. Of course they must. That is true of any contract which is open to construction, as we think this one, in its application to the facts, is not. And, in passing, we may suggest the utter lack of reason, on the merits, for confining defendants' general and unlimited underwriting of the obligations of the milling company to the moneys used at Waseca, when those used at Minneapolis were just as much requested; just as much used and probably, so far as profit is concerned, just as much if not more enjoyed.

Those moneys were as much the subject matter of the guaranty as the others and defendants should respond—are solemnly bound to respond—for the entire amount.

In 22 C. J. 1112, the parol evidence rule is given its usual application to contracts of guaranty and in the note are cited cases, the effect of which is stated substantially as follows:

Parol evidence is not admissible so to vary an unambiguous written guaranty as to prove concerning it that: (1) It was not intended to be continuous. Schneider-Davis Co. v. Hart, 23 Tex. Civ. App. 529, 57 S. W. 903; (2) although reading "until further notice" it was limited to one year, Indiana Bicycle Co. v. Tuttle, 74 Conn. 489, 51 Atl. 538; (3) it was to be made good out of certain funds only, McCambridge & Co. v. O'Callaghan, 27 Pa. Super. 199; (4) although covering materials, delivered to certain persons up to fixed amount, it was intended to apply only to materials furnished to be used in execution of a particular contract, Henry McShane Co. v. Padian, 142 N. Y. 207, 36 N. E. 880, 1 Misc. 332, 20 N. Y. Supp. 679, 48 N. Y. St. Rep. 705; (5) although a guaranty of payment of all sums to become due "on account of coal" from a certain colliery, it was limited to a particular kind of coal, Hutchinson v. Root, 2 App. Div. 584, 38 N. Y. Supp. 16 (affirmed 158 N. Y. 681 mem. 52 N. E. 1124 mem.); (6) although a continuing guaranty of pay-

ment for goods delivered from time to time, it was intended as security for past indebtedness only. Pritchett Baugh & Co. v. Wilson, 39 Pa. St. 421.

The one thing about the case that has given us any pause at all is the relatively small portion of the account representing grain sold by plaintiff to the milling company. We conclude that it is covered by the guaranty because it is as clearly a case of money expended at the request and for the benefit of the milling company as the funds used to purchase grain on the open market. It is not a case of an article manufactured for the milling company nor of produce raised for it. Plaintiff is not in that kind of business. It buys grain for immediate disposition. The mere fact that some of the grain furnished to the milling company had been purchased expressly for it and other grain of the same class and value happened to be purchased by plaintiff in the ordinary course of its business, ought not to make any difference in the result. The milling company had the direct benefit of plaintiff's money in one case as much as in the other. In each case the money used by plaintiff in purchasing grain was money furnished for and at the request of the milling company. To hold otherwise would apply a very technical distinction and do violence to the plain business common sense of the situation.

The order appealed from must be reversed and the case remanded for a new trial on the single issue as to the amount due. And, as to that, it will be for the trial court to say whether a new trial is necessary. A renewed motion on plaintiff's behalf for judgment may determine that question. We cannot undertake to determine the precise amount due. That is a question of fact, the initial determination of which is not for us. Counsel, on the record as it stands, should be able to make its solution an easy task.

Order reversed and the case remanded for further proceedings not inconsistent herewith.

ON PETITION FOR REHEARING.

On May 2, 1924, the following opinion was filed:

STONE, J.

Respondents' petition for rehearing is denied, but its tenor is of that commendable character which deserves this additional comment.

Counsel for respondents fear that the opinion, as it stands, will be considered as overruling, in part at least, Wyman, Partridge & Co. v. Bible, 150 Minn. 26, 184 N. W. 45; Bradshaw v. Barber, 125 Minn. 479, 147 N. W. 650, and Lehigh Coal & Iron Co. v. Scallen, 61 Minn. 63, 63 N. W. 245. In those cases the question of the reasonableness, in some aspect, of credit extended under a guaranty was held to be for the jury, whereas in this case we have disposed of it as a matter of law. Lest others might construe the opinion to the same effect, we desire to make it clear that it is not intended to overrule the cases mentioned or any one of them.

The distinguishing and controlling facts of this case must be kept in mind. It will be observed, first, that here the guaranty by its own terms was to continue until expressly revoked. Therefore, cases dealing with guaranties not so limited as to time have no application to this phase of the case. Next, it is to be noted that the credit was advanced to a corporation and that every cent of it was used for its proper corporate purposes, in the very business with respect to which the parties contracted.

The attempt here made, and the argument urged in the petition for rehearing, is that, notwithstanding the failure of the written contract to make any division of the moneys so furnished upon any basis of place or time, or to put a limit on the amount, and although all of the money in question was requested by the milling company, and procured upon the faith of the guaranty, and used in its corporate purposes, the court enforcing that contract should limit its effect to moneys actually expended in a given town, Waseca.

That indeed would be making a new contract for the parties. It would be relieving the guarantors from something over one-half of the obligation they assumed. The statement of the argument is its best refutation.

We realize full well that the result is a hardship to defendants. It was unnecessary for counsel to invite our attention to that. It is very unfortunate for defendants that they cannot be relieved of the obligations they assumed so unequivocally. But much more regrettable, and to be attended by much more damage, would be the establishment of the rule contended for by them, which in its general aspect is nothing more than an assertion that courts and juries may disregard plain written contracts and make them over to suit their own notions of what is right or expedient at the time being.

Criticism is made of that portion of the opinion to the effect that the credit was increased beyond $25,000 because of car shortage. The point is made that whether the car shortage was the sole occasion for the increased credit was a jury question. The record may leave that incidental inquiry somewhat in doubt. But we consider it wholly immaterial in view of the fact that none of the money was used for anything but the proper corporate purposes of the milling company. It may have been that the business was larger than anticipated. It may have been that grain was being held to an unusual extent or for longer periods than usual. Whatever the reason, it was purely an affair of the milling company. There was nothing improper about it and in no event nor in any possible aspect of the situation, can it be said that the plaintiff should suffer loss as a result.